IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 11-cv-03150-RBJ

MILES MULTIMEDIA, LLC, a Delaware limited liability company,

   Plaintiff,

v.

SCHUMANN PRINTERS, INC., a Wisconsin corporation,

   Defendant.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDER OF JUDGMENT**

Miles Multimedia, LLC, which purchased some of the assets of Weaver Publications, Inc., seeks a declaration that it has no successor liability to pay Weaver's outstanding debt to Schumann Printers, Inc. The case was tried to the Court on April 22-23, 2013. For the reasons set forth herein, the Court resolves the issues in favor of Miles Multimedia.

**Findings of Fact**

Peter Koclanes founded Weaver Publications, Inc. in the mid-1980s. Weaver, a Colorado company, provided publishing and marketing services for convention and visitor bureaus and state tourism agencies, meaning that it assisted its customers in attracting visitors. The Colorado Tourism Office was one of Weaver's customers. Weaver would write articles about vacation opportunities in Colorado and then subcontract with printers who would print brochures, maps, and so forth. Weaver also subcontracted with other companies to distribute the materials, such as by placing them in racks and responding to telephone and other requests for information.

Over the years Weaver was a successful, profitable company, and among other things, it always timely and fully paid the invoices of the printers, distributors and other vendors that it engaged.

Mr. Koclanes remained Weaver's sole owner until 2004 when he sold 100% of its stock to Prospect Partners, a private equity fund. Prospect Partners then sold a minority interest in the company (technically the parent company, Weaver Holdings) back to Mr. Koclanes, and he continued as the company's president and a member of its board of directors. Prospect Partners caused Weaver to incur substantial bank debt, apparently the first time in its history that Weaver had had any significant "long term" debt. The debt was secured and was personally guaranteed by Prospect Partners.

In April 2010, during a board meeting attended by Mr. Koclanes and Weaver's Chief Financial Officer, Dianne Gates, Prospect Partners announced that it had decided to sell its interest in Weaver. Ostensibly this was because Weaver was the last holding in the portfolio of Prospect Partners' "Fund No. 1," and Prospect wished to close the Fund out. Prospect Partners also indicated that it was not pleased with Weaver's recent financial performance. Weaver soon thereafter engaged Jordan Edmiston of the Jordan Edmiston Group, Inc., an investment banking firm, to assist in the marketing and sale of the company. Edmiston assembled a list of approximately 90 prospective purchasers.

The initial 90 prospects were contacted and offered an opportunity to sign a "Non-Disclosure Agreement." Those that signed a Non-Disclosure Agreement were then given a "book" prepared by Edmiston. The book was intended to provide enough information, including financial information that Ms. Gates had been asked to provide, to enable a prospective purchaser to decide whether to submit a Letter of Intent. Ms. Gates testified that prospects who received the book were not expected to rely solely on the information in the book. Rather, they

2

would also do their own due diligence investigation in anticipation of possibly submitting an offer to purchase Weaver.

Miles Multimedia, LLC, a Delaware company headquartered in Florida, was one of Weaver's principal competitors. Its founder, owner and chief executive is Roger Miles. Miles Multimedia was not included in the initial list of 90 possible buyers compiled by Mr. Edmiston because Weaver was reluctant to provide its financial information to Mr. Miles.

I will pause here to describe a unique aspect of this business that is important to the story as it unfolded. Customers of companies like Weaver and Miles Multimedia typically want to introduce a new set of tourism brochures and information at the beginning of each new calendar year. As a result, subcontractors such as printers hired by Weaver or Miles Multimedia do a huge volume of work during approximately mid to late October through the end of December of the previous year. Their charges add up quickly, but their invoices might not come due until December, January or February. Similarly, companies like Weaver and Miles Multimedia generate a high percentage of their revenues from their customers and from persons and entities who wish to place advertisements in the brochures during the period of time towards the end of a calendar year and the beginning of the next calendar year.

Although Miles Multimedia was not one of the 90 prospects contacted by Weaver, it is a fairly small industry, and by November of 2010 Mr. Miles had become aware that Weaver was for sale. Up to that point Miles Multimedia had focused primarily on the east coast. Mr. Miles was interested in expanding to the west and, eventually, internationally. Weaver had customers in Colorado and other points west and southwest, including California, and Mr. Miles saw an opportunity to obtain some of those customers for Miles Multimedia. He acknowledges that the desire to eliminate a competitor was another factor in his thinking. He thought that Weaver's

position in the industry was declining, at least in part because Weaver historically emphasized print materials whereas the direction of the industry was towards electronic information. In fact, he thought there was a decent chance that if he did nothing, Weaver would collapse, and he could pick up the pieces "for free." However, he believed that he would have a better shot at Weaver's customers with Weaver's help.

Therefore, on December 7, 2010 Mr. Miles contacted Edmiston, expressed an interest, and requested "due diligence materials." Interestingly, even though the list of prospects had been substantially reduced by then, the information he requested was not initially provided. According to Mr. Miles, he spent approximately a month negotiating about the terms of a Non-Disclosure Agreement. Among other things not provided to him was a list of Weaver's creditors.

While the marketing efforts were going on, the period of intense activity that occurs during the last three months of each calendar year was underway. One of Weaver's vendors was Schumann Printers, Inc., a printing company located in Wisconsin. Weaver first hired Schumann in 2009. However, Greg Hadden, Weaver's Director of Operations at the time, had had a relationship with Schumann and the Schumann family for some 20 years and thought highly of them. Schumann's work in 2009 was, as expected, excellent. Weaver paid Schumann's invoices for the 2009 work fully and timely.

By the time the busy October through December 2010 season arrived, Schumann was Weaver's largest printing vendor. During that period Schumann's invoices totaled $994,139. This represented work done in November 2010 ($375,547), December 2010 ($585,136) and January 2011 ($35,453). Schumann, like other vendors, was not aware that Weaver was in the process of being sold.

As Schumann's invoices and invoices from other vendors were received, both Mr. Koclanes and Ms. Gates wanted them to be paid. Ms. Gates was satisfied that Weaver had the wherewithal to pay them, just as it had always done. However, Maneesh Chawla, who was representing Prospect Partners' interests, refused to permit Ms. Gates to pay Schumann or any other invoice without his approval. He told Mr. Koclanes that Schumann had to be a "big boy," which Mr. Koclanes interpreted to mean that he did not intend to pay Schumann's invoices. In fact, Mr. Chawla never did approve payment of Schumann's or other vendors' invoices. Accordingly, when Schumann's credit manager Leann Kinderman. became concerned that the invoices were not being timely paid and attempted to find out from Ms. Gates what was happening, Ms. Gates did not return her calls. There was nothing that she could do.

Meanwhile the list of prospective purchasers had dwindled to three. Madden Media, another competitor, attended a management presentation in November 2010 and had requested additional information. Mr. Miles attended a management presentation on December 23, 2010. Progress Equity, another private equity firm, attended a management presentation on January 3, 2011, but did not remain interested.

Mr. Miles describes the December 23, 2010 management presentation as uninformative, mostly consisting of information on the industry that he already knew, but vague on specifics. Mr. Chawla did indicate, however, that it would be a stock transaction. Mr. Miles had acquired companies in the past but always as an asset purchase. He understood that a typical stock purchase would require that the purchaser step into the shoes of the seller and become responsible for the seller's liabilities, but he was unwilling to do that. Mr. Miles was consulting with several "advisors," including a private equity firm individual who sat on Miles Multimedia's board; another individual who was experienced in mergers and acquisitions; his

5

banker; and a successful private equity consultant.  They were advising him against a standard stock acquisition as well.

On January 11, 2011 Mr. Edmiston sent Mr. Miles an email describing "how a deal could work."  On January 17, 2011 Mr. Miles made the first of what would become three offers to Weaver.  In the first offer, contained in a letter of intent (Exhibit 6), his proposal was that (1) Miles Multimedia would acquire 100% of Weaver's stock; (2) Miles would pay $3 million in cash in three $1 million installments, one of which was contingent upon the Colorado Tourism Office's awarding its new contract to Miles; (3) but Weaver would leave its existing cash, believed by Mr. Miles to be at least $1.9 million needed to cover the nine-ten month period after February/March 2011 when employees' salaries and other debts would come due without significant revenues, in the company, thus reducing the net cash payment to approximately $1 million; (4) Weaver would be debt-free, i.e., all liabilities would be taken care of by Weaver and not remain when the stock was acquired; and (5) Weaver would partner with Miles in a response to the Colorado Tourism Office's Request for a Proposal.  Mr. Miles considered the "debt-free" term to be critical, because "I wasn't buying any debt."  He had not even been informed as to what Weaver's debt was.

Mr. Chawla rejected that first proposal, indicating among other things that the cash had to be higher.  On January 20, 2011 Mr. Miles extended his second offer, again in the form of a letter of intent. Exhibit 7.  Basically it was the same as the first offer, except that the cash component was replaced with a $1 million cash payment payable in four $250,000 installments.  Again, Weaver would be required to be debt-free, this time by retaining enough cash to pay its liabilities.  This offer too was rejected.  However, Mr. Chawla said that Weaver would be open to an assets sale.

At about the same time Mr. Koclanes learned that Weaver was negotiating with Madden Media concerning a possible assets sale. Mr. Koclanes adamantly opposed the potential deal with Madden, because he learned that Madden's plan was to fire Weaver's employees. Apparently because of Mr. Koclanes' opposition, Madden Media fell out of the picture, leaving Miles Multimedia as the only remaining suitor.

Mr. Miles and Mr. Chawla continued to talk. Mr. Miles learned that Prospect Partners intended to have Weaver do an Assignment for the Benefit of Creditors or "ABC." He had to call his bank to learn what that was. An ABC is a means of liquidating assets to pay creditors, essentially an insolvency proceeding that is an alternative to a Chapter 7 or Chapter 11 bankruptcy governed by federal law. Mr. Miles acknowledges that this signaled to him that it was unlikely that everyone who was entitled to be paid would get paid.

On January 28, 2011 Mr. Miles and Mr. Chawla reached a verbal agreement on an asset purchase. On January 29, 2011 Mr. Miles met with Mr. Koclanes and Ms. Gates and received additional operating and financial information. On January 31, 2011 Miles tendered its third letter of intent to Weaver. Ex. 36.

Under this proposal, which Mr. Miles regarded as essentially equivalent to his first two offers from his perspective, just structured differently, (1) Miles Multimedia would pay Weaver $400,000 in cash; (2) Miles Multimedia would pay a royalty obligation Weaver owed to the Colorado Tourism Office in the amount of $100,000 directly to the Colorado Tourism Office; (3) Miles Multimedia would fulfill Weaver's obligations to distribute materials to customers under contract, called by the parties "fulfillment services," which would avoid Weaver's defaulting on those obligations; (4) Miles would attempt to collect Weaver's accounts receivable, still estimated to be approximately $1.8 million and turn what it collected over to Weaver; and (5)

Weaver would retain all cash it then possessed, approximately $1.7 million.  In exchange, (1) Miles would have access to Weaver's customer list; (2) Weaver would partner with Miles in making a pitch to the Colorado Tourism Office; (3) Miles would receive Weaver's personal property (office equipment, fixtures, computers, etc.); (4) Miles would receive Weaver's "trade credits;" and (5) Miles would assume no other debts or obligations of Weaver and would not assist Weaver in the payment of those debts.

An Asset Purchase Agreement, Exhibit 12, was prepared, and the deal closed on February 14, 2011.  Mr. Miles received a list of Weaver's royalty obligations owed to its customers, which also showed Weaver's debts to its vendors (but not Weaver's outstanding bank debt) at the closing.

Miles did hire Mr. Koclanes, Ms. Gates, Mr. Hadden and the majority of Weaver's employees, largely because of their relationships with Weaver's customers whom Miles hoped to keep.  However, none of the directors or shareholders of Weaver became directors or shareholders of Miles Multimedia.

Miles Multimedia's $400,000 cash payment went to the trustee for the Assignment for the Benefit of Creditors, Silverman Consulting.  The trustee also received the $1.7 million of Weaver's retained cash and approximately $1.5 to $1.6 million of Weaver's accounts receivable that Miles was able to collect on Weaver's behalf.  The trustee applied the funds to the secured bank debt.

In addition to guaranteeing payment of the bank debt, Prospect Partners had "forced" (Mr. Koclanes' word) Mr. Koclanes to guarantee $1.5 million of the bank debt by telling him that the bank required it, and that Weaver would be closed if he refused.  Mr. Koclanes later learned that the bank had not required his guarantee, and perhaps as a result, Prospect Partners

removed him from the guarantee. Prospect Partners apparently had to go into its pocket to some extent to complete the payment of the bank debt or otherwise settle with the bank.

Unsecured creditors were not paid. Weaver owed Mr. Koclanes approximately $2.5 million, relating back to Prospect Partners' acquisition of Weaver. This debt was not paid. In fact, Mr. Koclanes voluntarily used more than $50,000 of his own money to cover insurance premiums for employees during the transition period. Ms. Gates did not receive a bonus owed to her by Weaver of approximately $30,000. The vendors, including Schumann which was Weaver's largest trade creditor, were not paid.

Shortly after the closing Mr. Miles contacted several of the largest vendors and, while he did not offer to pay their invoices, he indicated that he would work with them to provide opportunities for them to do business with Miles. The first call he made was to Dan Schumann. Mr. Schumann was willing to provide printing services to Miles but insisted that it be on a cash on delivery basis or that it be personally guaranteed by Mr. Miles. Miles engaged Schumann for two projects on that basis. However, unfortunately in this Court's view, the two parties could not thereafter agree on terms that they both would accept, and that was the end of the business relationship between Miles and Schumann. Miles Multimedia has, however, continued to do business with the other five of the six largest Weaver vendors.

Schumann sued Weaver, and so far as this Court is aware, that suit may still be pending. However, Schumann apparently indicated that it might sue Miles Multimedia on a successor liability theory. Miles won the race to the courthouse by filing the present suit, seeking a declaration that it has no obligation to Schumann.

Schumann wasn't the only unpaid vendor that squawked. Vision Graphics, which had prepared maps for Weaver, threatened to interfere with Miles' distribution of the maps; Miles

9

settled by paying half their loss and offering them new business. On-time Delivery threated to cease fulfilling its contract and to seize assets; Miles negotiated a settlement and paid them $10,000. USA-800, which provided a call-in service, refused to permit Miles to use the telephone number until it paid $7,000 that was owed to it. Miles paid. But while Miles negotiated relatively small settlements with those three vendors, Schumann's debt was another story. Weaver's obligation to Schumann's of $994,139, exclusive of interest, is not only the largest vendor obligation, but it constituted close to half of the total and dwarfed the others. *See* Exhibit 8.

### Conclusions of Law

When one company sells its assets to another company, the general rule is that the successor company is not liable for the debts and liabilities of the transferor. *Ruiz v. ExCello Corp.,* 653 P.2d 415, 416 (Colo. App. 1982). Colorado recognizes four exceptions to that rule:

> (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.

*Id.*

Schumann argues that Miles Multimedia is liable for Weaver's debts under the fourth exception, because the transaction was entered into fraudulently to escape liability for such debts. "Generally, whether a transfer is fraudulent is a question of fact." *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 530 (Colo. App. 2010). In denying Miles Multimedia's motion for summary judgment, *see* Order of February 27, 2013 [#35], the Court concluded that Schumann had come forward with sufficient evidence to create a genuine issue of material fact as to whether the transfer of Weaver's assets to Miles Multimedia was fraudulent. The Court now

concludes that, while fraud might be attributed to Weaver, Miles Multimedia was not a participant in it.

Schumann looks to the Colorado Uniform Fraudulent Transfer Act ("CUFTA"), C.R.S. § 38-8-101 et seq., for guidance as to what constitutes a fraudulent transfer. It does so while recognizing that CUFTA does not expressly provide a damages remedy. The remedies provided by CUFTA for a fraudulent transfer are avoidance of the transfer; attachment of the assets transferred or other property of the transferee; an injunction against further disposition of such assets or property; a receivership; or "any other relief the circumstances may require." C.R.S. § 38-8-108. In any event, Schumann has not filed a counterclaim in this case.

However, in its summary judgment order, this Court agreed that CUFTA was a reasonable source of information as to what constitutes a fraudulent transfer. "Schumann's reliance on the factors that the legislature has already identified as circumstances appropriate for consideration in determining if a transfer was fraudulent is not misplaced." Order, February 27, 2013 [#35] at 4. Under CUFTA, a transfer of assets by a debtor is fraudulent as to a creditor if the debtor made the transfer

> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor
>
>> (I) Was engaged or was about to engage in a business or a transaction for which the remaining assets or the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (II) Intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

C.R.S. § 38-8-105(1)(a), (b).

There is no smoking gun that establishes that Weaver made the transfer of assets to Miles Multimedia with the specific intent to hinder, delay or defraud Schumann. Plainly that was not

11

the intent of Mr. Koclanes or Ms. Gates, but they were not in a position to speak for Weaver. There is no direct evidence that Prospect Partners entered into the transaction with Miles Multimedia with the actual intent to hinder, delay or defraud Schumann.  However, one would not expect Schumann to be able to obtain direct evidence of Prospect Partner's intent, nor is that necessary.  *See Yetter Well Service, Inc. v. Cimarron Oil Co.,* 841 P.2d 1068, 1070 (Colo. App. 1992).  As is often the case, one must look to circumstantial evidence of intent.

Prospect Partners had little if any concern about vendors such as Schumann.  Mr. Chawla wanted to sell Weaver and to avoid or minimize liability on Prospect Partners' personal guarantee of the bank debt.  He surely knew that there were insufficient assets to pay both the bank debt and the vendors.  He also surely knew that in the Assignment for the Benefit of Creditors, Weaver's assets would be applied first to the secured debt, thereby reducing or eliminating Prospect Partners' exposure on its guarantee.

Accordingly, while there is no evidence that Prospect Partners was specifically motivated by a desire to hinder, delay or defraud Weaver's creditors, it can reasonably be inferred that Mr. Chawla brought about the transaction knowing that this would be the result.  Generally it can be said that an individual intends a result if he is substantially certain that his act will produce the result.  Accordingly, this Court finds, based on the evidence presented in this trial, that Prospect Partners' conduct "manifested the type of intent which imposes liability under the fraudulent conveyance statute."  *Yetter,* 841 P.2d at 1070.  The Court need not further consider the several "badges of fraud" on which Schumann relies, because it is satisfied that Prospect Partner's actions are sufficient to establish Weaver's actual intent.

However, Weaver's intent does not translate into liability by Miles Multimedia for Weaver's debts.  The evidence presented at trial established that Miles' assert purchase was the

product of an arms-length transaction between unrelated parties.  A "legitimate sale carried on at arms length" does not lend itself to successor liability.  *See Hickman v. Thomas C. Thompson Co.,* 592 F.Supp. 1282, 1284 (D. Colo. 1984).  *Cf. Walk-in Medical Centers, Inc. v. Breuer Capital,* 778 F.Supp. 1116, (D.Colo. 1991)(holding in a garnishment action that "[b]efore a transfer of corporate assets can be set aside or a money judgment entered . . . a plaintiff must show that both the transferor and the transferee had the intent to defraud, hinder or delay creditors."); *U.S. v. Morgan,* 554 F. Supp. 582, 586 (D. Colo. 1982)(holding in a criminal case that when a transfer is between unrelated parties, "[w]ant of consideration or knowledge of the fraud on the part of the transferee must also be shown.").

Moreover, while the form of the transaction changed from a stock purchase to an asset purchase, Mr. Miles made it unmistakably clear in each of his three offers that he would not take responsibility for Weaver's debts.  This is repeated in the Asset Purchase Agreement, Exhibit 12, section 3.1.  By way of belt and suspenders, the Asset Purchase Agreement, section 3.2, also disclaims that there was a de facto merger.  Courts do not lightly set aside or modify the terms of a contract negotiated between unrelated, competing businesses.

Schumann attempts to draw Miles Multimedia in by arguing "want of consideration," that is, that Miles did not provide reasonably equivalent value for the assets it acquired.  This argument is based largely on Schumann's interpretation of Schedules 2.1(a) and 2.1(e) to the Asset Purchase Agreement.  Schedule 2.1(a) purports to be a list of personal property acquired by Miles in the asset purchase and values associated with each item.  The bottom line suggests a total book value of $2,833,077.  Schedule 2.1(e) lists "trade credits" acquired by Miles in the asset purchase.  It suggests that the "total usable value" of the trade credits is $424,680.

If it were appropriate to compare the total of those numbers, about $3.26 million, to the cash Miles paid directly to Weaver ($400,000), it would follow that Miles did not provide reasonably equivalent value. However, the evidence does not support that conclusion for several reasons.

First, Schedule 2.1(a) is essentially a list of assets acquired by Prospect Partners when it purchased Weaver. It lists these assets at their amortized book value as of whatever date the schedule was printed. However, that "accounting number" does not reflect the fair market value of the assets when Miles acquired them.

Second, although the schedule purports to list all personal property purchased, there are at least three items listed that, according to Ms. Gates who was the Chief Financial Officer of Weaver and became the Chief Financial Officer of Miles, were not acquired: construction in progress, leasehold improvements, and goodwill. "Goodwill" in particular is a significant item, accounting for $1,554,576 of the $2,833,077 book value. However, Mr. Miles, Mr. Koclanes and Ms. Gates all testified that Miles did not acquire or pay for "goodwill." This is a relic from the Prospect Partners' acquisition in 2004 when, according to Mr. Koclanes, Prospect Partners knowingly paid more than the value of the tangible assets, thus creating a book entry for "goodwill" that thereafter remained on the books. However, by the time of Miles' asset purchase, Weaver had experience, according to Mr. Koclanes, two less-than-stellar years, and its balance sheet was "not pretty." Miles acquired "goodwill" in the sense that Weaver had historically enjoyed a good reputation in the industry, and its employees had built strong, positive relationships with its customers. However, there was no "goodwill" purchased in accounting terms.

Third, Mr. Miles testified that he valued the personal property at $112,000. There was no other evidence of the actual fair market value of these assets. Similarly, despite Schedule 2.1(e), the testimony at trial was that the true usable value of the trade credits sold to Miles was between $100,000 (per Mr. Miles) and $154,000 (per Ms. Gates). Other than what appears in Schedule 2.1(e), which the witnesses debunked, there was no contrary evidence.

As for what Miles provided in return, one must remember that, in addition to the $400,000 cash that Miles paid to Weaver (by paying the ABC trustee Silverman Consulting), Miles agreed to pay and did pay Weaver's outstanding royalty obligation to the Colorado Tourism Office of $100,000.[1] Miles agreed to provide and did provide "fulfillment services," meaning that it fulfilled Weaver's outstanding obligations to its customers. These costs to Miles were self-serving in the sense that they paved the way for Miles' solicitation of the former Weaver customers. Nevertheless, this represented a form of consideration to Weaver.

One must also remember that Miles did not acquire Weaver's cash, approximately $1.7 million. Also, as agreed, Miles collected approximately $1.5 to $1.6 million of Weaver's accounts receivable, which it turned over to the trustee.

At bottom, the evidence does not support a finding that Miles did not provide reasonably equivalent value for what it acquired. Mr. Miles' interest was in Weaver's customer base. It is possible that if Mr. Miles had bided his time and Weaver had been liquidated, Miles Multimedia could have had Weaver's former employees and customers without purchasing any assets. Instead, Mr. Miles made the business judgment that he would have a better shot at the customers

---

[1] Miles more or less paid Weaver's royalty obligations to several other customers as well. However, these were "voluntary" payments. They were limited to customers who were willing to enter into an "acceptable" contract with Miles Multimedia, and Mr. Miles characterized them as "signing bonuses." His solicitation efforts were generally successful. Miles Multimedia managed to retain 11 of Weaver's 14 customers, including the Colorado Tourism Office.

this way. *See* Exhibit 47.  Naturally, he negotiated the best price that he could.  However, there was no evidence of any collusion.  There was no evidence that he had any desire to assist Weaver dodge its creditors.  There was no credible evidence that Miles Multimedia did not provide reasonably equivalent value for what he acquired.  *Cf.* C.R.S. § 38-8-109(1)(a transfer is not voidable under CUFTA against a person who took in good faith and for a reasonably equivalent value); § 38-8-104(2)(for purposes of CUFTA, "a person gives reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive sale.").

      Nor did the transaction with Miles cause Weaver to be unable to pay its vendors.  It might be that if Weaver had not been sold, it could and would have paid its vendors.  However, the decision to sell Weaver, made by Prospect Partners for its own reasons, triggered a chain of events that left the vendors out in the cold.  In that context Weaver was not able to pay both its vendors and its long-term debt.  Prospect Partners still had an interest in getting as much as it could for the assets it sold to Miles, if only to reduce its own exposure on its guarantee.  That the proceeds of the sale were distributed to the secured creditor by the ABC trustee and not to unsecured creditors, including Mr. Koclanes and Ms. Gates as well as the vendors, followed in normal course.  It was not Miles' doing.

      I understand Schumann's frustration.  Unbeknownst to Schumann, while it was fulfilling its contract, Prospect Partners was negotiating the sale of the company.  The product that Schumann produced for Weaver was used to help to fulfill Weaver's obligations to its customers, and Miles no doubt established goodwill with the customers by completing Weaver's obligations to them.  Schumann and the other vendors deserved to be paid.  However, the Court cannot find on the record of this case that Miles Multimedia has a legal obligation to pay those debts.

**Order**

For the foregoing reasons, the Court declares that Miles Multimedia, LLC has no obligation to pay the debt that Weaver Publications owes to Schumann Printers, Inc. and directs that a final written judgment be entered in favor of the plaintiff and against the defendant. As the prevailing party Miles Multimedia is awarded its necessary and reasonable costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 2nd day of May, 2013.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge